## GREER v. UNITED STATES.

United States District Court
S. D. New York.

June 1, 1950.

Decree Affirmed Feb. 7, 1951.

See 187 F.2d 5.

Nathan Baker, Hoboken, N. J., for plaintiff.

Horace M. Gray, New York City, for the United States.

NOONAN, District Judge.

The law applicable to the facts in this case as they have been developed upon the trial seems clear. The obligation of seaworthiness which traditionally extended from the ship to its seamen has been extended to longshoremen while working aboard a vessel, even though the latter are employed by an independent stevedoring contractor. Seas Shipping Co. v. Sieracki, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099. The libelant was an employee of an independent contractor working as a longshoreman aboard the ship. As such the shipowner owed the libelant a duty to maintain a seaworthy ship, and to provide a safe place to work. However, when an owner of a vessel surrenders control of any part of his ship to a stevedore in charge of loading or unloading, the owner's duty of seaworthiness as to the part surrendered exists only up to the time the stevedore assumes control. Grasso v. Lorentzen, 2 Cir., 149 F.2d 127.

We then come to a consideration of the facts in this case. After carefully weighing all of the testimony in this case, it is my considered opinion that the libelant has not established by a fair preponderance of the credible evidence either negligence on the part of the shipowner, or that any injuries libelant may have received were occasioned because of an unseaworthy condition on the vessel here involved.

Even if the unseaworthy condition which libelant complains of, did, in fact, exist at the time of the accident at the No. 3 hatch, it appears from the facts adduced at the trial that such a condition was not in existence when the owner surrendered control of that part of the vessel to the stevedores.

In reaching this determination, I have given the greatest consideration to the question of credibility, and as I have indicated I am of the opinion that the libelant has not established his case by a fair preponderance of the credible evidence.

### Findings of Fact

1. The vessel, "SS John W. Powell" was a Liberty type vessel, and on February 12, 1946 was owned, operated and controlled by the United States of America under a general agency agreement with Cosmopolitan Shipping Company, Inc.

2. On February 12, 1946, the "SS John W. Powell" was moored starboard side to

a pier at the Naval Ammunition Depot, Leonardo, New Jersey.

3. The vessel had arrived at said pier on February 4, 1946, on which date the discharging of the cargo was started.

4. The cargo of boxed ammunition aboard said vessel was discharged by the James Healing Company, stevedores, under a stevedoring contract with the United States Navy.

5. The following is a schedule of the times during which the James Healing Company unloaded such cargo from Hold No. 3 of said vessel:

| Date | Time |
| --- | --- |
| February 5, 1946 | 0800–1130 |
| | 1330–1845 |
| February 6, 1946 | 0830–1130 |
| | 1330–1800 |
| February 7, 1946 | 0830–1200 |
| | 1330–1800 |
| February 8, 1946 | 0800–1130 |
| | 1330–1800 |
| February 9, 1946 | 0800–1200 |
| | 1315–1800 |
| February 10, 1946 | (Sunday—no work) |
| February 11, 1946 | 0815–1130 |
| | 1330–1800 |
| | 1930–2400 |
| February 12, 1946 | 0800–1130 |
| | 1300–1800 |
| | 1930–2345 |

6. Libelant, Harry J. Greer, was employed by the James Healing Company, as a longshoreman, and had been so employed for three years prior to February 1946.

7. On February 9th and February 12th, 1946, the libelant was employed as a longshoreman by said stevedore company and worked in No. 3 hold as a "hold man".

8. The discharging of the "SS John W. Powell" was performed exclusively by said stevedore company and the officers and crew of the vessel did not participate in the unloading operation. The stevedore company was in control of Hold No. 3 during the entire working period when the cargo was being discharged from said hold.

9. On February 12, 1946, the longshoremen were discharging cargo from No. 3 lower hold.

10. The hatch at No. 3 hold measured about 20′ x 20′; the depth to upper deck 37′ 4″; depth to 2nd deck 28′ 7″; the distance between upper deck and 2nd deck was approximately 10″.

11. A steel ladder, with rungs 12″ apart, leading from the bottom of No. 3 hold to the main deck was located in the center of the after end of the hatch.

12. At about 11:45 o'clock P.M. on February 12, 1946, the libelant fell from the aforesaid ladder in No. 3 hold as he was ascending from the 'tween deck with his overcoat over his left arm, falling about 8 feet and landing on the cargo in the lower hold.

13. The said ladder was not defective.

14. The mainmast was located 15 feet forward of the forward end of No. 3 hatch, on which mast were located two floodlights at a height of about 20 feet from the main deck.

At the time of said fall, the two floodlights located on the mainmast, each containing an electric bulb of from 200 to 500 watts, were lighted and their light was directed downward at an angle of about 45° and into the hold, and illuminated the after portion of No. 3 'tween deck and the after ladder.

15. The vessel furnished to the longshoremen, for use in No. 3 hold, electric power and two portable lights on lengths of electric cable known as "cluster lights", which the longshoremen lowered into and suspended in the hold for illumination in such positions as they desired from time to time.

16. The raising, lowering and positioning of said cluster light in No. 3 hold was under the exclusive control and direction of the longshoremen in the gang working that hold.

17. At the time libelant fell, members of the stevedore gang were covering up the hatch on main deck, and had replaced

two cross beams, and two sections of the hatch cover on the forward end, leaving the after end of the hatch open to enable the libelant to come up.

18. As No. 3 hold was being unloaded, the longshoremen placed the dunnage in that hold alongside of and parallel to the bulkhead in the after end of the No. 3 'tween deck, and from time to time the longshoremen removed such dunnage in drafts from the vessel to the pier.

19. At the time of libelant's fall, the 'tween deck of No. 3 hold in the area of the hatch coaming and the after ladder was clear of any dunnage except as safety flooring and the libelant had unobstructed access to said ladder.

20. The after ladder in No. 3 hold from the 'tween to the weather deck was adequately lighted by the floodlights upon the mainmast to permit its use safely.

21. By reason of his fall libelant sustained a fracture of the right tibia at the medial malleolus of the right foot and concussion of the brain.

22. The libelant has recovered from said injury with slight, if any, loss of function in the right foot, and there are objective symptoms of the post concussion syndromes.

23. No credible evidence was offered that any portion of the hull or any of the appurtenances or equipment of the vessel was in an unseaworthy condition.

24. The respondent furnished the libelant a reasonably safe place within which to work and adequate appliances and equipment.

25. Libelant has not established by a fair preponderance of the evidence that his injury was caused by any negligence on the part of the respondent, or that it resulted from an unseaworthy condition of the "SS John W. Powell".

### Conclusions of Law

1. The respondent fulfilled all its legal obligations to the libelant.
2. The libelant's injuries did not result in whole or in part from any negligence of the respondent or of any of its agents.

3. During all the times mentioned in the libel, the "SS John W. Powell" was in all respects seaworthy.

4. The libel should be dismissed.